Filed 6/18/26  Ruiz v. Espinoza CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| REBECCA RUIZ, as Trustee, etc., | B341375 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STPB09113) |
| v. | |
| MARIA ESPINOZA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gus T. May, Judge.  Affirmed.

Chhokar Law Group, David G. Greco, and Kristen A. Friedman for Plaintiff and Appellant.

Bewley, Lassleben & Miller and Leighton M. Anderson for Defendant and Respondent.

Appellant Rebecca Ruiz (Ruiz) and respondent Maria Espinoza (Espinoza) were both named as beneficiaries under the terms of a restated trust that includes a no contest provision. Following the trustor's death, Espinoza filed a response to and partial joinder in another party's petition to remove Ruiz as trustee and invalidate the trust, but after a threat of sanctions and communications with opposing counsel, Espinoza filed a "supplement" to her response and joinder to clarify she was not contesting the trust's validity. Ruiz asked the probate court to nonetheless enforce the no contest provision against Espinoza, and the court declined—reasoning that Espinoza had abandoned any contest the response and joinder might be read to present without using the "machinery of the law" in a manner triggering the no contest provision. We consider whether the order denying Ruiz's petition for instructions to enforce the no contest provision against Espinoza is appealable and, if so, whether the probate court erred in declining to enforce the no contest clause against Espinoza.

## I. BACKGROUND

### A. Estate Planning

In 1998, Michael J. McGill (Michael) and his wife Sandra M. McGill (Sandy) (collectively, the McGills) executed the "McGill Family Living Trust" (the original trust). Under the terms of the original trust, the trust estate, including the McGills' Whittier home, was to be distributed to their only child M.M. upon the second trustor's death.[1] The original trust contained a no contest

---

[1] Neither Ruiz nor Espinoza was named as a beneficiary of the original trust.

2

provision: "If any beneficiary under this trust in any manner, directly or indirectly, contests this trust or any of its provisions, any share or interest in Trustors' estate given to that contesting beneficiary under this trust is revoked and shall be disposed of in the same manner provided herein as if that contesting beneficiary had predeceased Trustors without issue." The original trust also provided that either of the trustors could revoke the trust.

Following M.M.'s death in 2012, the McGills amended the original trust and made Sandy's niece Vanessa Cabral (Vanessa) the beneficiary. Under the amendment, if Vanessa predeceased the McGills, the estate would pass to Sandy's sister Sharon Halpern (Halpern).[2] At the same time of the amendment, Sandy executed a Uniform Statutory Form Power of Attorney appointing Michael as her agent, which vested him with the power to conduct, among other things, "[e]state, trust, and other beneficiary transactions."

Nearly a decade later, in April 2021, after Sandy's health had entered a period of physical and psychiatric decline, Michael revoked the original trust and replaced it with the "M & S McGill Family Trust." In connection with establishing the M & S McGill Family Trust (the new trust), Michael obtained a Certificate of Independent Review certifying Michael was counseled by an attorney about bequests to Ruiz and Espinoza provided for in the new trust and the attorney found the proposed transfers were "not the product of fraud, menace, duress, or undue influence."

---

[2]     Neither Ruiz nor Espinoza was named as a beneficiary of the amended original trust.

3

Under the new trust document, Ruiz—who was described as a "family friend"—was named as the only successor trustee. In addition, Michael named Ruiz the trust's principal beneficiary following Sandy's death. The new trust also provided, however, that if Michael predeceased Sandy, Espinoza (who had worked as the McGills' housekeeper since 2012 and as Sandy's caregiver since 2020) would inherit the family home if she moved in and cared for Sandy, or she would be paid $4,500 a month as a caregiver if she did not move in.

Like the original trust, the new trust contained a no contest provision: "If any beneficiary of this trust . . . [¶] Directly contests or otherwise objects without probable cause in any court to the validity of [the new trust] . . . then the right of such beneficiary to take any interest given to him or her under this trust . . . shall be determined as it would have been determined had such beneficiary predeceased me without surviving issue." A "direct contest" was defined as "a contest that alleges the invalidity" of the new trust based on a number of grounds, including "[m]enace, duress, fraud, or undue influence."

The following month, Michael executed a restatement of the new trust, the material terms of which were identical to its predecessor. (For simplicity, our use of the term new trust includes the trust as restated.) In June 2022, a little over a year after creating the new trust, Michael died. Two months later, Ruiz, as successor trustee, provided written notice to Espinoza and others that they could not bring an action to contest the trust more than 120 days from the date of that notice.

4

### B.    Halpern Contests the New Trust's Validity

In September 2022, a month after Ruiz's notice, Halpern (Sandy's sister) filed a verified petition seeking instructions regarding the original trust's revocation and the new trust's validity; she also sought to remove Ruiz as trustee. Halpern alleged, among other things, that the new trust was invalid either because of Ruiz's undue influence or Michael's incapacity.

Halpern more specifically alleged that Ruiz had been absent from the McGills' lives beginning with M.M.'s passing in 2012 and continuing to 2020. At that time, as the McGills' health began to fail, Ruiz increasingly inserted herself into their lives, limiting who could have access to them. Over time, Ruiz allegedly came to "control and influence" Michael's mind and actions. Halpern alleged further that Ruiz took advantage of Michael's "trust and confidence" by convincing him to leave the bulk of the trust estate to her through the execution of the new trust. Then, after Michael died, Halpern alleged Ruiz "administered the [n]ew [t]rust solely for her benefit." Among other things, Halpern alleged Ruiz failed to pay Espinoza the $4,500 per month she was entitled to receive under the new trust as Sandy's caregiver.

Ruiz responded by filing a verified objection to Halpern's petition. She maintained there was no undue influence and explained she and M.M. were "best friends growing up" and she and the McGills became "especially close" after M.M.'s death such that they came to treat each other as a "second family." As evidence of her closeness with the McGills, Ruiz stated Sandy in 2018 appointed Ruiz as her healthcare agent—with Michael as the first alternative. Ruiz denied misusing or misallocating trust assets and she maintained that all payments owed to Espinoza as

5

Sandy's caretaker had been paid (but she advised no further payments to Espinoza would be made because she had terminated Espinoza's services for "medically and physically neglecting" Sandy).

### C. *Espinoza's Response to and Joinder in Halpern's Petition, and Ruiz's Vigorous Reaction*

In April 2023, Espinoza filed a verified "Response and Joinder of Beneficiary/Responding Party" (the Response) that "join[ed] in the request for relief by . . . Halpern . . . to the extent herein stated." The Response articulated Espinoza's interest in the matter (pursuant to Probate Code section 1043, which allows an "interested person" to file a pre-hearing response or objection) as an interest in contesting Ruiz's "wrongful[ ] terminat[ion of Espinoza's] employment in violation of the trust provisions" that "ma[de] express provision for [Espinoza] to provide ongoing, in-home personal care, attention and support to [Sandy]. . . ."

After paragraphs of factual allegations, including an allegation that Michael recorded a video before his death stating his wishes concerning bequests to Espinoza and Ruiz, Espinoza joined in Halpern's allegations of standing to bring her (Halpern's) petition for instructions, declined to join Halpern's allegations that Michael lacked capacity to revoke the original trust, and specifically requested the court to make instructions "regarding the validity of the provisions of the [new trust] relating to [Sandy's] care including the provisions related to (i) the intended compensation to [Ezpinoza] for such care, and (ii) the interest in the real property of the trust that [Michael] transferred to [Espinoza], or as apparently transferred to her as

6

the Court may determine."[3]  In addition, Espinoza joined in Halpern's request that Ruiz be removed as trustee (for asserted breaches of fiduciary duty to the new trust's beneficiaries, including herself and Sandy) and asked the court to order Ruiz to provide an accounting.[4]  Espinoza further joined in certain allegations in [Halpern's] petition seeking instructions on the validity of the new trust, and she specifically "join[ed] in the claim for relief in the Petition with respect to the invalidity of any and all provisions favoring Ruiz[ ] on the grounds stated in the Petition and further based on the presumption of fraud or undue influence (Probate Code § 21360 et seq.)."[5]

---

[3]     Elaborating, Espinoza asserted the court's instructions should include a statement of her "right to the payments specified" and "her right (and the right of [Sandy]) for [Espinoza] to resume providing in-home care, attention, and companionship . . . ."

[4]     The probate court would later suspend Ruiz as successor trustee following an evidentiary hearing.  The court appointed an interim successor trustee and ordered Ruiz to provide an informal accounting of the new trust's income and expenditures.

[5]     Espinoza's response included a prayer for relief of sorts at the end asking the court to (1) order Ruiz removed as trustee and appoint Halpern in her place, (2) order Ruiz to provide an accounting of all assets and expenditures, (3) order Ruiz to restore "to the trust estate of any existing or valid trust . . . all money, property or other assets obtained, used, acquired or expended by Ruiz or for her benefit," (4) determine Espinoza's right to the specified payments for caring for Sandy, and (5) for "instructions to said trustee regarding the validity and effectiveness of the trust and other instruments executed or made

7

Ruiz reacted to Espinoza's Response with a flurry of litigation activity, all premised on the idea that the Response should be considered an untimely trust contest. As we will describe in more detail, Ruiz served (but did not file) a motion for sanctions, she filed a motion for summary adjudication, she filed a petition for instructions to enforce the no contest provision against Espinoza (the filing at issue in this appeal), and she filed a motion for judgment on the pleadings.

### 1. *Motion for sanctions*

Two months after the Response's filing, Ruiz served but did not file a motion for sanctions.[6] The proposed sanctions motion argued Espinoza's Response was a trust contest that was filed outside the applicable 120-day period for the filing of such contests.

Through an exchange of correspondence thereafter, counsel for Espinoza and Ruiz debated the merits of the sanctions motion. Espinoza maintained the Response was not meant to contest the validity of the new trust—as that was the only trust document in which Espinoza was named as a beneficiary—but rather a "middle-ground" position between Halpern's petition to

---

by Michael . . . in about April or May, 2021, including the effectiveness, if any, of purported donative transfers to . . . Ruiz."

[6] Ruiz's sanctions motion invoked the provisions of sections 128.5 and 128.7 of the Code of Civil Procedure. Those sections require a party moving for sanctions to provide the responding party with a 21-day "safe harbor" period to withdraw or correct the challenged action or tactic before filing the sanctions motion. (Code Civ. Proc. §§ 128.5, subd. (f)(1)(B), 128.7, subd. (c)(1).)

8

wholly invalidate the new trust and Ruiz's position to the contrary. As a "[c]ure," Espinoza offered to stipulate to the following: "the Response is not intended to be, and should not be construed to be, an independent contest of the validity of the [new] trust or any of its provisions; and that the Response is only intended to express the views and contentions of [Espinoza] on the matters alleged in [Halpern's] Petition."

Ruiz disputed Espinoza's contention that the Response was not a trust contest, arguing the substance of the pleading and its practical effect showed it was and emphasizing it sought different relief from the relief sought by Halpern. Ruiz also rejected Espinoza's proposal to clarify her response and joinder, and thereby "cure" the issue for which sanctions were requested, because Ruiz believed the proposal was "essentially an effort to withdraw a trust contest in the hopes that . . . Espinoza's untimely trust contest d[id] not result in her being disinherited under the no contest clause."

Shortly after the exchange of attorney correspondence, and without an agreement among counsel on a "cure," Espinoza unilaterally filed on July 25, 2023, a supplement to her earlier Response (the First Supplement). The First Supplement reasserted her request to remove Ruiz as trustee (and alleged additional facts in support of that request) but explained the "removal of the trustee for breaches of impartiality or loyalty is independent of the challenge to the validity of the [new trust] documents alleged in [Halpern's] Petition. [Espinoza's] interest in the trust is solely as a beneficiary of the [new trust] documents (including the unilateral revocation of the [old trust]). Contrary to self-serving allegations by the trustee, . . . [Espinoza] does not seek to invalidate any of the [new trust] documents, since they

9

are the only source of the trustor's . . . donative provisions in [Espinoza's] favor." The First Supplement elaborated:

3. Among other things, the new trust provides for income to be paid to [Espinoza] and for her to have a right of occupancy of the residence while she would continue to provide care, support and companionship to the surviving spouse and one of the original settlors of the trust, [Sandy]. Without notice and without cause, the trustee benefitted her own interests as the residuary beneficiary of the new trust by (i) terminating all such payments to [Espinoza]; and (ii) excluding [Espinoza] from the residence and from any contact or communication with [Sandy].

4. The purported basis for the exclusion— that [Espinoza] allegedly caused injuries to [Sandy] in providing in-home assistance of a non-medical nature—is fabricated in the sense that any symptoms actually suffered by [Sandy] were in existence at the time that [Espinoza] was working faithfully together with [Michael] to provide in-home care to [Sandy] under the supervision of a professional medical team of physicians and nurses. If called to testify, the in-home care nurses (LVNs) would testify very favorably regarding the value of [Espinoza's] ministrations to [Sandy], showing the false allegations by the trustee to be intended maliciously and in the trustee's personal interests.

5. The trustee has further refused to restore possession to [Espinoza] of a motor vehicle for which she ([Espinoza]) is the registered owner, the vehicle having been given to [Espinoza] by the now-deceased settlor . . . during his life.

6. In addition, the trustee has self-interestedly asserted that the challenge to the validity of the . . . new trust by . . . Halpern represents a trust contest by [Espinoza] that could (if lacking in probable cause) be contrary to the no-contest provision of the trust as challenged by [Halpern]. In support of that argument (not yet alleged in any pleadings or papers on file with the Court), the trustee has alleged that [Espinoza's] existing Response and Joinder reflects such a contest.

7. This supplement therefore expressly disclaims any such contest to the validity of the trust or any provisions, while acknowledging that such a contest exists as a consequence of the Petition by [Halpern].

8. The provisions of the [new trust] documents in favor of [Espinoza] are independent of the donative transfers to Ruiz. [Espinoza] has no interest in whether the donative transfers to Ruiz stand or fall, whether or not evidentiary presumptions of fraud or undue influence (Probate Code §21360 et seq.) apply. [Espinoza] has never

intended to seek relief on that issue and disclaims any intention to do so.

> 9. That assurance has been communicated to the trustee. Despite that, the trustee is attempting to leverage the trustee's (erroneous) argument by offering an agreement on behalf of the trust not to pursue a no-contest/forfeiture defense against [Espinoza], if [Espinoza] would agree to withdraw any support for, or cooperation with, Halpern's petition to remove the trustee and to be appointed as the conservator . . . . (Underlining in original omitted.)

A few weeks thereafter, Espinoza filed a second supplement to her Response. The second supplement addressed various procedural and discovery-related issues, but did not materially depart from the First Supplement's substantive allegations.

### 2. *Motion for summary adjudication*

In the meantime, Ruiz had on July 10, 2023, moved for summary adjudication on the question of whether the Response was a timely filed trust contest. The motion argued Espinoza's Response was a direct contest that sought different relief than Halpern's trust contest and lacked probable cause due to its belated filing. The motion was focused solely on whether the Response was an untimely trust contest and did not argue any consequence—specifically, disinheritance under the new trust's no contest provision—should flow from the resolution of that question.

12

Espinoza opposed the motion. Among other things, she argued the Response was not untimely and was not an action to contest the new trust or any of its provisions; the Response's "sole purpose" was to "preserve . . . the donative provisions and other instructions" made for Espinoza's benefit. Espinoza also offered to expressly "disclaim any invalidating trust contest" above and beyond the disclaimer included in her First Supplement that had by then already been filed.

The probate court held a hearing and denied the motion for summary adjudication on procedural grounds (summary adjudication of the issue presented could not be had and Ruiz, in any event, had not obtained court permission to file the motion).

### 3. *No contest petition*

In August 2023, shortly after moving for summary adjudication on Espinoza's Response, Ruiz also petitioned for instructions enforcing the new trust's no contest provision against Espinoza (the "no contest petition"). The verified no contest petition contended that because Espinoza's Response sought relief different than that sought by Halpern's petition, the Response was an independent trust contest that lacked probable cause because it was filed months beyond the statutory deadline.

Espinoza objected to the no contest petition. She argued the primary purpose of the new trust was to provide for Sandy's care if Michael predeceased her and Ruiz contravened that purpose by dismissing Espinoza as Sandy's caregiver. Espinoza also explained she was initially left "confused and uncertain" on how to respond to Halpern's petition: Ruiz's allegations about her abuse of Sandy "cut very deep," but it would be "contrary to her interests" to attack the validity of the new trust because she was

13

not a beneficiary of the original trust. Accordingly, the "focus and intention of [the Response] was not to invalidate provisions affecting Ruiz, but rather to <u>shield</u> the provisions benefitting Espinoza from the breadth of Halpern's attack—or, at least, to attempt to do so." (Underlining in original.) Espinoza reiterated she did not intend to contest the new trust; she instead sought only "the enforcement of [the new trust], and especially the provisions favoring [her] and her ongoing care for [Sandy]." Espinoza maintained her Response, as clarified by her First Supplement, "did not . . . seek to invalidate any trust provision"; it only "commented on claims, issues[,] and contentions asserted by Halpern."

### 4. *Motion for judgment on the pleadings*

Before the no contest petition was heard, Ruiz additionally moved for judgment on the pleadings with regard to her no contest petition and again asserted Espinoza's Response was an untimely trust contest. Espinoza opposed this motion too. She argued, among other things, that Ruiz's motion improperly sought relief identical to that sought in the motion for summary adjudication and failed to discuss the "multiple affirmative defenses" raised in her objection to the no contest petition.

The probate court denied the motion for judgment on the pleadings.[7] That left Ruiz's no contest petition as the only matter

---

[7] At the hearing on the motion, however, the probate court asked the parties to later file supplemental briefs on issues it considered relevant to a determination of the then still-pending no contest petition: whether a party can "'unring the bell,'" i.e., "amend [its] way out of [a trust contest]"; whether a party could escape the consequences of filing a trust contest by having its

14

left for the court to resolve on the question of whether Espinoza should be disinherited on no contest grounds.

### D. *The Probate Court Denies the No Contest Petition*

In advance of the hearing on Ruiz's no contest petition, Espinoza argued in her supplemental brief that, when "[f]airly read," the Response was "not the commencement of any proceeding or claim for relief," but an effort to defend Michael's intentions "specifically in relation to the trust provisions mandating [Sandy's] continuing care by [her]." Espinoza contended her pleading was "defensive in nature" and included "statements of joinder" with Halpern's petition only because they "were in the nature of statements of non-opposition." The only goal of the Response was to "preserve" provisions in the new trust favoring Espinoza.

Espinoza also argued that to the extent there was any confusion about the Response's purpose, her First Supplement (filed during the 21-day safe harbor period following service of the proposed sanctions motion) clarified she disclaimed any contest of the new trust's validity or the validity of the donative transfers to Ruiz. In addition, Espinoza contended that because she did not use the "machinery of the law" to thwart Michael's intent and because Ruiz, in light of Halpern's contest, was not prejudiced by the Response, the Response did not constitute a

---

attorney file a "motion saying, 'It was my fault. I made a mistake. Th[ose contest allegations] shouldn't have been included'"; and whether Espinoza had "standing to challenge . . . Ruiz's role . . . serving as trustee."

15

true trust contest; at best, the Response was only a "'paper contest' . . . 'abandoned without action.'"

Ruiz's supplemental brief disputed Espinoza's contentions. She argued the Response, as originally filed, was a direct trust contest because Espinoza did not merely join Halpern's petition but also added an allegation about a legal presumption of fraud that was not present in Halpern's petition. Ruiz also disagreed that a party could avoid the consequences of a direct contest by attempting to withdraw it later, as such conduct would defeat the purpose of a no contest provision. In Ruiz's view, Espinoza's First Supplement to the Response may have shielded her from sanctions but it did not protect her from disinheritance through operation of the new trust's no contest provision. In addition, Ruiz maintained the sham pleading doctrine prevented Espinoza from avoiding the effects of her Response by filing an inconsistent supplement to it. Ruiz also maintained Espinoza's Response was not harmless because it prompted discovery-related litigation.

Espinoza filed a reply contending the Response could not constitute a direct contest because it did not commence the proceedings and did not seek any affirmative relief. She also argued that even if the Response could be considered a trust contest, it was not untimely because the applicable deadline applies only to pleadings commencing an action; the Response, in other words, was not untimely because Halpern's earlier petition had already disputed the validity of the new trust.

The probate court held a hearing on the no contest petition in September 2024.[8] The court found that when the Response and the First Supplement were considered together, Espinoza did not knowingly use the "machinery of law" to file a petition to thwart Michael's intent or gain an advantage. The court observed that it would make "no sense" for Espinoza to attempt to thwart Michael's intent "because[,] of course[,] if the [new] trust were invalidated, [Espinoza] is out of the picture entirely [as a trust beneficiary]." (The court allowed, however, that if Espinoza had waited longer than three months after filing the Response to amend it with her supplement, the result "may" be different.) Because the court found the Response, as clarified by the First Supplement, was not a trust contest, it denied Ruiz's no contest petition without reaching the issue of whether the Response had been filed without probable cause.[9]

## II. DISCUSSION

We hold the probate court's order denying the no contest petition is appealable because the Probate Code expressly authorizes appeals from orders determining which persons are entitled to receive distributions. We further hold on the merits— and strictly construing the no contest provision to avoid forfeiture

---

[8] At the hearing, Ruiz's attorney agreed with the probate court that the issue of whether the Response was a trust contest was "settleable" without an evidentiary hearing.

[9] Although the court did not say at the hearing whether the no contest petition was denied with or without prejudice, the subsequent minute order stated the petition was denied "without prejudice."

17

(Prob. Code,[10] § 21312; *Burch v. George* (1994) 7 Cal.4th 246, 254-255)—that the probate court's ruling was not error. Owing to some clumsy drafting, it is unclear whether the substance and practical effect of the Response alone was to impugn the validity of the new trust; obviously, it did not join Halpern in seeking to invalidate the new trust entirely because that was the only trust document with bequests to Espinoza, and she maintains the joinder was intended to accordingly *limit* any relief Halpern might obtain on her petition and to allege facts supporting Ruiz's removal as trustee. But even if the Response by itself were viewed as a trust contest, the trial court appropriately considered the Response in tandem with the First Supplement—filed soon thereafter and before Ruiz ever argued in court that the new trust's no contest provision should be enforced against Espinoza—to correctly conclude the Response was just a paper contest that was effectively abandoned such that it did not warrant enforcement of the no contest provision.[11]

### A. The Order Denying the No Contest Petition Is an Appealable Order

As a general rule, an order dismissing a claim without prejudice is not appealable because it is not a final determination of the parties' rights. (See, e.g., *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1106 [the result of "keeping the dismissed count

---

[10] Undesignated statutory references that follow are to the Probate Code.

[11] In light of our disposition of this appeal, we (like the trial court) need not consider whether the Response was brought without probable cause.

18

legally alive" is that there is no finality for appealability purposes]; accord, *Gutkin v. University of Southern California* (2002) 101 Cal.App.4th 967, 975 [voluntary dismissal of remaining claims without prejudice "could not have the legal effect of a final judgment, and could not serve to expedite an appeal" from interim orders].)

Probate proceedings can be an exception to this general rule. "[U]nlike civil appeals, which generally are governed by the 'one final judgment' rule [citation], appeals can properly be taken under the Probate Code from a variety of orders issued at different junctures during the administration of a probate estate." (*Godoy v. Linzner* (2024) 106 Cal.App.5th 765, 773-774; see Code Civ. Proc., § 904.1, subd. (a)(10) [an appeal may be taken "[f]rom an order made appealable by the Probate Code"]; Prob. Code, §§ 1300-1304 [identifying appealable orders].) As our highest court has explained, "'[t]he administration of a decedent's estate involves a series of separate proceedings, each of which is intended to be final.'" (*Estate of Callnon* (1969) 70 Cal.2d 150, 156, quoting *Estate of Loring* (1946) 29 Cal.2d 423, 428; accord, *Meyer v. Meyer* (2008) 162 Cal.App.4th 983, 992.) Consequently, a probate order may be appealable as a final order "even if it did not fully dispose of every issue" before the probate court. (*Godoy*, *supra*, at 774; *Gridley v. Gridley* (2008) 166 Cal.App.4th 1562, 1573-1574, 1586-1587 & fn. 6.)

The order denying Ruiz's no contest petition is appealable because the Probate Code provides that an appeal may be taken from an order "[d]etermining heirship, succession, entitlement, or the persons to whom distribution should be made." (§ 1303, subd. (f); *Esslinger v. Cummins* (2006) 144 Cal.App.4th 517, 523 ["An order determining the existence of a power, duty, or right under a

trust is appealable"]; see also *Estate of Friedman* (1979) 100 Cal.App.3d 810, 813 & fn. 2 [order determining that the filing of a proposed petition would violate the no contest clause was appealable because the order determined "'heirship or the persons to whom distribution should be made or trust property should pass'"]; *Estate of Black* (1984) 160 Cal.App.3d 582, 585 & fn. 3 [same].) The probate court's order denying the no contest petition determined that by filing her Response (and the supplements thereto) Espinoza did not jeopardize her beneficial entitlements under the new trust and it did so conclusively and on the merits—i.e., it did not leave unresolved or postpone for future determination any issues related to the applicability of the no contest provision to Espinoza's supplemented Response.[12]

### B.   The Response at Most Was a "Paper Contest" That Was Effectively Abandoned

"[A] no contest clause in a trust instrument 'essentially acts as a disinheritance device, i.e., if a beneficiary contests or seeks to impair or invalidate the trust instrument or its provisions, the beneficiary will be disinherited and thus may not take the gift or

---

[12]   That the words "without prejudice" were later added to the record after the hearing does not alter our analysis as to the order's finality and appealability. Because the probate court decided the no contest petition on the merits and did not—in either its statements at the hearing or in its minute order—leave unresolved any issue related to the petition, the addition of "without prejudice" is reasonably read as clarifying that, in the event Espinoza filed a further supplement to the Response that once again appeared to challenge the validity of the new trust or any of its provisions, Ruiz could file a new no contest petition.

20

devise provided under the instrument.' [Citation.]" (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 422.) Such provisions "have long been held valid in California." (*Ibid*.)

A no contest clause is enforceable against a "direct contest that is brought without probable cause."[13] (§ 21311, subd. (a)(1).) A "'[c]ontest'" is a "pleading filed with the court by a beneficiary that would result in a penalty under a no contest clause, if the no contest clause is enforced." (§ 21310, subd. (a).) A "'[p]leading'" is defined as a "petition, complaint, cross-complaint, objection, answer, response, or claim." (§ 21310, subd. (d).) A "'[d]irect contest' . . . alleges the invalidity of a protected instrument or one or more of its terms, based on one or more of" certain enumerated grounds, including "[m]enace, duress, fraud, or undue influence." (§ 21310, subd. (b)(4).)

A court's application of a no contest clause to a proposed action is informed by competing policy interests. On the one hand, "[s]uch clauses promote the public policies of honoring the intent of the donor and discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument." (*Donkin*, *supra*, 58 Cal.4th at 422.) On the other hand, these interests are "[i]n tension with . . . the policy interests of avoiding forfeitures and promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument." (*Ibid*.)

---

[13] "[P]robable cause exists if, at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).)

Thus, determining "'[w]hether there has been a "contest" within the meaning of a particular no-contest clause depends upon the circumstances of the particular case and the language used.' [Citations.] '[T]he answer cannot be sought in a vacuum, but must be gleaned from a consideration of the purposes that the [testator] sought to attain by the provisions of [his] will.' [Citation.] Therefore, even though a no contest clause is strictly construed to avoid forfeiture, it is the testator's intentions that control, and a court 'must not rewrite the [testator's] will in such a way as to immunize legal proceedings plainly intended to frustrate [the testator's] unequivocally expressed intent from the reach of the no-contest clause.' [Citation.]" (*Burch*, *supra*, 7 Cal.4th at 254-255; see also § 21312 ["In determining the intent of the transferor, a no contest clause shall be strictly construed"].) Courts "look to the substance of th[e] petition and its 'practical effect'" and "are not bound by [the petition's] label." (*Estate of Stoker* (2011) 193 Cal.App.4th 236, 241; accord, *Urick v. Urick* (2017) 15 Cal.App.5th 1182, 1197.)

Precedent additionally observes that "the mere filing of a paper contest, which has been abandoned without action and has not been employed to thwart the testator's expressed wishes, need [not] be judicially declared a contest. But wherever an opponent uses the appropriate machinery of the law to the thwarting of the testator's expressed wishes, whether he succeed or fail, his action is a contest." (*Estate of Hite* (1909) 155 Cal. 436, 443-444; see also *Jacobs-Zorne v. Superior Court* (1996) 46 Cal.App.4th 1064, 1076.)

Obviously, Espinoza's Response is not expressly styled as a "contest" of the new trust. That contest had been filed by Halpern. Instead, Ruiz argued Espinoza's Response should be

22

*deemed* a contest in substance and practical effect. But that would be odd when considering, as we must, "'the circumstances of the particular case and the language used'" and the maxim that no contest provisions must be strictly construed. (*Burch, supra*, 7 Cal.4th at 254-255.) Only the new trust gave Espinoza an interest in Michael's estate: the family home to Espinoza upon Sandy's death (if she were an in-home caregiver) or $4,500 monthly payments (if she were not). Espinoza had no beneficial interest under the terms of the original trust, and there is accordingly no reason to construe her partial joinder in Halpern's petition as joining in Halpern's effort to contest the validity of the new trust. It is accordingly a close question whether, looking at the Response in isolation, it is best read as a "middle-ground" statement of position (albeit an inartfully articulated one) that expressly disclaimed Halpern's allegation that Michael had no capacity to create the new trust; joined in Halpern's allegations that Ruiz was wrongfully withholding the $4,500 payments to Espinoza; and joined only in the allegations that Ruiz had exercised undue influence, should be removed as trustee, and at most the donative provisions in her favor should be invalidated as a result (rather than the new trust entirely).

The trial court, however, viewed the Response in light of the First Supplement filed soon thereafter and found that even if the Response were deemed a trust contest, it was a contest that had been effectively abandoned via the First Supplement without invoking the appropriate "machinery of the law" to thwart Michael's intent.

That analytical approach is the right one. (*Hite, supra*, 155 Cal. at 443-444; *Jacobs-Zorne, supra*, 46 Cal.App.4th at 1076.) The Response was filed in April 2023. When Ruiz's attorney

23

surfaced his concern in the sanctions motion served (but never filed) two months after the Response that it implicated the trust's no contest provision as drafted, Espinoza's attorney promptly (on July 10, 2023) offered to correct the record to disclaim any intent to contest the trust's validity. That offer was rejected, but Espinoza corrected the record anyway by filing the First Supplement in July 2023—which disclaimed any challenge to the new trust's bequests to Ruiz and which was filed before Ruiz took the position in court that Espinoza should be disinherited by operation of the no contest clause.[14] The only thing of note that transpired in the interim was (1) Ruiz's motion to quash a third-party subpoena served by Espinoza for Sandy's medical records (in an effort to disprove Ruiz's assertions of substandard care)—but that was relevant to the separate request to remove Ruiz as trustee of the trust and to preserve the donative provisions of the new trust in Espinoza's favor, and (2) Ruiz's procedurally improper summary adjudication motion filed the same day as Espinoza's letter offering to correct the record.

Under the circumstances, Espinoza's Response was at most a paper contest that had been abandoned. Indeed, as the trial court appeared to recognize, deeming Espinoza's effort to explain why the probate court should preserve the bequests she believed she was owed under the terms of the new trust (and to express support for removal of Ruiz as trustee for denying her those bequests) as grounds to disinherit Espinoza is what would truly thwart Michael's intent.

[14] Ruiz's petition for instructions as to the new trust's no contest clause was filed on August 15, 2023.

24

## DISPOSITION

The order denying the no contest petition is affirmed. Espinoza is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



HOFFSTADT, P. J.



MOOR, J.